## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|                          |   |                          |
|--------------------------|---|--------------------------|
|                          | : |                          |
| DANA G.,                 | : |                          |
|                          | : |                          |
|   plaintiff,   | : |                          |
|                          | : |                          |
| v.                       | : | CASE NO. 3:21cv182 (RAR) |
|                          | : |                          |
| KILOLO KIJAKAZI,         | : |                          |
| COMMISSIONER OF SOCIAL   | : |                          |
| SECURITY,                | : |                          |
|                          | : |                          |
|   defendant.   | : |                          |

### RULING ON PENDING MOTIONS

Dana G. ("plaintiff") appeals the final decision of the Commissioner of Social Security ("the Commissioner") pursuant to 42 U.S.C. § 405(g). The Commissioner denied plaintiff's application for Social Security Disability Benefits in a decision dated June 17, 2020. Plaintiff timely appealed to this Court. Currently pending are plaintiff's motion for an order reversing or remanding her case (Dkt. #18) and defendant's motion to affirm the decision of the Commissioner. (Dkt. #22.)

For the reasons that follow, plaintiff's motion to remand is DENIED and defendant's motion to affirm is GRANTED.

### THE ALJ'S DECISION

Plaintiff requested a hearing before an administrative law judge ("ALJ") on September 6, 2019. On April 15, 2020, a hearing was held before ALJ Brien Horan. The ALJ issued an opinion on

June 17, 2020, finding that plaintiff was not disabled within the meaning of the Social Security Act.

Applying the five-step framework, the ALJ found at step one that plaintiff had not engaged in any substantial gainful activity since December 31, 2017. (R. 21.) At step two, the ALJ found that plaintiff had the following severe impairments: spine disorder, attention deficit hyperactivity disorder (ADHD), anxiety disorder, dysfunction of major joints, and obstructive sleep apnea. (R. 22.)

At step three, the ALJ determined that plaintiff had no impairments or combination of impairments equal to a Listing. The ALJ concluded that plaintiff did not meet or medically equal Listing 1.02 (major dysfunction of a joint) or Listing 1.04 (disorders of the spine). (R. 23.) The ALJ also determined that plaintiff's mental impairments did not meet or medically equal Listing 12.04 (depressive, bipolar and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), or Listing 12.11 (neurodevelopmental disorders. (R. 26-27.) The ALJ also concluded that plaintiff did not have at least two "marked" limitations or one "extreme" limitation to meet the paragraph B criteria. (R. 24.)

The ALJ found that plaintiff had a mild limitation in interacting with others. (R. 24.) The ALJ based his assessment on plaintiff's treatment records with Kerin Orbe, D.O., and

Margaret Trussler, A.P.R.N., and noted that plaintiff is a dedicated mother and lives with her children. (R. 23.)

The ALJ found that plaintiff had a moderate limitation in concentrating, persisting or maintaining pace. (R. 24.) The ALJ noted that plaintiff's treatment notes from October 2017, right before the date last insured, with APRN Trussler showed poor focus. (R. 24.) However, the ALJ relied upon the treatment notes from Dr. Orbe, which showed intact concentration, because plaintiff treated with Dr. Orbe for the majority of the relevant period. (R. 24.)

The ALJ found that plaintiff had a moderate limitation in adapting or managing oneself. (R. 24.) The ALJ relied on plaintiff's overall treatment history, noting that she is engaged in therapy and takes prescription medication to treat her ADHD. (R. 24.) While plaintiff was emergently hospitalized for mental health reasons, the ALJ noted that the treatment records reflect that plaintiff's hospitalization was a result of plaintiff's abuse of her medications, and there was no other indication of mental decompensation or a need for long-term treatment. (R. 24.)

The ALJ also concluded that plaintiff failed to meet any of the criteria for "paragraph C." (R. 24.)

At step four, the ALJ determined that plaintiff had a light RFC. (R. 24.) The ALJ found that plaintiff was

limited to simple, routine, repetitive tasks in a work
setting with only occasional changes, occasional reaching,
handling, fingering, and feeling with bilateral upper
extremities, frequent balancing kneeling, and climbing
ramps/stairs, occasional stooping and crouching, and no
crawling or climbing ladders/ropes/scaffolds. (R. 24.)

The ALJ could not defer or give any specific
evidentiary weight to any medical opinions, including the
state medical consultants. (R. 27.) The ALJ found the
consultative examiner's opinions only partially persuasive
because they did not provide sufficient substantive
analysis to support their conclusions. (R. 27.)

At step five, the ALJ determined plaintiff had prior
relevant work experience as a shipping order clerk and a
general office clerk. (R. 28.) The ALJ concluded that
plaintiff could not perform the past relevant work. (R.
28.) The ALJ relied on the testimony of vocational expert
("VE") Victor Alberigi to determine that there were jobs
within the national economy that plaintiff could perform,
including furniture rental clerk, counter clerk, and usher.
(R. 29.) The ALJ then concluded that plaintiff was not
disabled within the meaning of the Social Security Act. (R.
30.)

Plaintiff requested a review by the Appeals Council,
which affirmed her denial on December 14, 2020. Plaintiff
then appealed to this Court.  The Court notes that
plaintiff filed a "Statement of Material Facts" on August
14, 2021. (Dkt. #19.)  While agreeing in significant part
with the facts, the Commissioner filed a responsive
statement of facts along with its motion to affirm the
decision of the Commissioner. (Dkt. # 22-2.) The Court has
fully reviewed and generally adopts the facts as set forth
by plaintiff and supplemented by the Commissioner. While
utilizing these facts, the Court will further supplement
throughout the discussion as necessary.

**STANDARD**

"A district court reviewing a final . . . decision [of the
Commissioner of Social Security] pursuant to section 205(g) of
the Social Security Act, 42 U.S.C § 405(g), is performing an
appellate function." Zambrana v. Califano, 651 F.2d 842, 844
(2d Cir. 1981).[1]  "The findings of the Commissioner of Social
Security as to any fact, if supported by substantial evidence,
[are] conclusive . . . ." 42 U.S.C. § 405(g).  Accordingly, the
court may not make a *de novo* determination of whether a
plaintiff is disabled in reviewing a denial of disability

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation
marks, alterations, emphases, footnotes, and citations are omitted.

benefits.  Id.; Wagner v. Sec'y of Health and Human Servs., 906
F.2d 856, 860 (2d Cir. 1990).  Rather, the court's function is
to ascertain whether the Commissioner's conclusion is based upon
the correct legal principles, and whether the decision is
supported by substantial evidence.  Johnson v. Bowen, 817 F.2d
983, 985 (2d Cir. 1987).

Therefore, absent legal error, this Court may not set aside
the decision of the Commissioner if it is supported by
substantial evidence. Berry v. Schweiker, 675 F.2d 464, 467 (2d
Cir. 1982). Further, if the Commissioner's decision is supported
by substantial evidence, that decision will be sustained, even
where there may also be substantial evidence to support the
plaintiff's contrary position. Schauer v. Schweiker, 675 F.2d
55, 57 (2d Cir. 1982).

The Second Circuit Court of Appeals has defined substantial
evidence as "'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'" Williams on
Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)
(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).
Substantial evidence must be "more than a scintilla or touch of
proof here and there in the record." Williams, 859 F.2d at 258.

The Social Security Act ("SSA") provides that benefits are
payable to an individual who has a disability.  42 U.S.C.
§ 423(a)(1).  "The term 'disability' means . . . [an] inability

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . ."  42 U.S.C. § 423(d)(1).  To determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[2]

To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.[3]

---

[2] The five steps are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits the claimant's mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider the claimant disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the severe impairment, the claimant has the residual functional capacity to perform the past work; and (5) if the claimant is unable to perform the past work, the Commissioner then determines whether there is other work which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.  20 C.F.R. § 416.920(a)(4)(i)-(v).

[3] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work."  Id.

## **DISCUSSION**

Plaintiff raises four arguments to support the reversal or remand of the Commissioner. First, plaintiff argues that the ALJ erred by finding that plaintiff did not have at least two "marked" or one "extreme" limitation such that she would have qualified for "paragraph B" at step two. (Dkt. #18-1 at 3.) Second, plaintiff argues that the ALJ erred by not finding her lumbar spine impairment severe. (Dkt. #18-1 at 3.) Third, plaintiff argues that the ALJ erred by failing to explain the credibility findings and/or weight he assigned to the opinions of plaintiff's treating physicians and consultative examiners, and whatever weight was assigned to these opinions was not supported by substantial evidence. (Dkt. #18-1 at 19-20.) Fourth, plaintiff argues that the ALJ's findings that she had an RFC of light work and that there were jobs that existed in sufficient numbers in the national economy that plaintiff could perform were not supported by substantial evidence. (Dkt. #18-1 at 3-4.)

Defendant argues that the sole issue is whether the ALJ's decision was supported by substantial evidence. (Dkt. #22 at 2.)

How the parties define the issues makes no difference to the structure of this opinion; the Court will address each issue in turn.

### a. *Paragraph B*

Plaintiff argues that the ALJ should have found that she had marked limitations in concentrating, persisting or maintaining pace and adapting and managing oneself or that the ALJ should have found that plaintiff had an extreme limitation in either or both of those categories.

The Social Security Administration regulations define "moderate" limitations as: "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, §12.00(F)(2)(c). "Marked" limitations are defined as: "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." Id. at § 12.00(F)(2)(d). "Extreme" limitations are defined as an inability "to function in this area independently, appropriately, effectively, and on a sustained basis." Id. at § 12.00(f)(2)(e). Concentration, persistence, or pace are "the abilities to focus attention on work activities and stay on task at a sustained rate." Id. at § 12.00(E)(3). Adapting or managing oneself involves "the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." Id. at § 12.00(E)(4).

> ### i. *Concentrating, Persisting, or Maintaining Pace*

For her ability to concentrate, persist, or maintain pace, plaintiff argues the substantial evidence in the record supports that she does not have the stamina or ability to focus due to

her physical pain, sleep apnea, and mental health conditions. (Dkt. #18-1 at 6.) Plaintiff relies on the results from her two sleep studies and visits to the Danbury Hospital Community Center for Behavioral Health to support these limitations. (Dkt. #18-1 at 6-8.)

The medical records from APRN Trussler prior to plaintiff's date last insured, December 31, 2017, shows that APRN Trussler was concerned with plaintiff's ability to focus. APRN Trussler noted that plaintiff was "disorganized, evasive in answering questions directly, frequently changing the topic or direction of [the] conversation, giving only partial pieces of information and when asked for more information on a topic that she discloses she will quicky change topics." (R. 888.) Plaintiff reported to APRN Trussler that she is disorganized and "frequently unable to complete tasks." (R. 888.) APRN Trussler's mental status exam of plaintiff noted she was "disorganized, evasive, distractable" and has poor focus. (R. 890.) At the initial visit, APRN Trussler was concerned at how disorganized plaintiff presented despite the high level of stimulant medication plaintiff was on but noted that plaintiff seemed to have improved at a later visit, though plaintiff was still "unfocused, rambling, tangential, and restless." (R. 884, 886, 890.)

On December 15, 2017, APRN Trussler noted that plaintiff
looked "poorly," but was "less pressured and better organized in
her presentation despite her complaint of excessive fatigue and
time in bed" after not being on a stimulant for several weeks.
(R. 881.) Though APRN Trussler noted that plaintiff was better
organized, she also noted that plaintiff's "global functioning
seems to have declined." (R. 881.) APRN Trussler was also "not
confident that [plaintiff] has clear ADHD," and instead thought
that plaintiff's symptoms could be attributed to plaintiff's
underlying sleep disorder. (R. 883.) Besides APRN Trussler's
objective notes, APRN Trussler include subjective commentary
from plaintiff about her disorganization. (R. 885, 888.)

Treatment notes with Dr. Orbe, from November 15, 2016,
through June 21, 2017, indicate that plaintiff's concentration
was intact. (R. 1116, 1119, 1123, 1126, 1129, 1133.) Dr Orbe
noted that plaintiff was digressive, but redirectable, which Dr.
Orbe contributed to plaintiff's ADHD. (R. 1120, 1123, 1128,
1130, 1131, 1133.) Dr. Orbe had started plaintiff on Strettera
to help address her attention and focus by treating plaintiff's
anxiety, and plaintiff eventually started a lower dose. (R. 646,
1128, 1130, 1133.) Dr. Orbe then started plaintiff on fish oil
to "help boost her attention/focus." (R. 646.) On April 3, 2017,
Dr. Orbe noted that plaintiff's "attention and focus are still
not optimal" and started her on another medication and increased

the amount of fish oil plaintiff was taking. (R. 642.) Dr. Orbe's notes also reflect subjective statements from plaintiff indicating an inability to concentrate or focus. (R. 640, 644, 647.)

Other treatment notes from May 27, 2015, through September 13, 2016, do not have any indicators marked for plaintiff's concentration. (R. 1134-1141.) Treatment notes from November 15, 2016, and June 21, 2017, indicate that plaintiff struggles with attention and focus. (R. 1090, 1092.) Plaintiff's emergency room notes from October 18, 2017, indicate that her concentration was "distracted," and she was angry, agitated, and had an impaired fund of knowledge, though the notes indicate plaintiff "abused xanax." (R. 437, 438, 952, 953.)

The ALJ relied on APRN Trussler and Dr. Orbe's treatment notes to find that plaintiff has a moderate limitation in concentrating, persisting, or maintaining pace. (R. 24.) The ALJ relied on Dr. Orbe's notes showing that plaintiff has intact concentration for the majority of the relevant period. (R. 24.) The ALJ also relied on the absence of any indication that plaintiff was struggling to complete or attend medical appointments. (R. 24.)

Examining the record as a whole, the ALJ's determination that plaintiff has a moderate limitation in her ability to concentrate, persist, and maintain pace is supported by

12

substantial evidence. Dr. Orbe's notes indicate that plaintiff's concentration is intact, they also reflect that she is digressive and reflect various medications and treatments for plaintiff's inability to concentrate. With such conflicting information, the Court notes that plaintiff might disagree with the ALJ's determination, "[b]ut whether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports *the ALJ's decision*." Bonet ex rel. T.B. v. Colvin, 523 Fed. Appx. 58, 59 (2d Cir. 2013).  Upon review, the ALJ's determination in this area is supported by substantial evidence and the Court will not disturb the moderate finding related to plaintiff's ability to concentrate, persist, or maintain pace is markedly limited.

### ii.  *Adapting or Managing Oneself*

For her ability to adapt and manage herself, plaintiff argues that her mental health diagnosis, limited range of motion, and/or chronic pain mean she is unable to manage her basic needs. (Dkt. #18-1 at 8.) Plaintiff relies on her testimony at the hearing in concert with medical records from Greater Danbury Community Health Center in which plaintiff was secretive about her circumstances after her children were removed from the home, a note from an emergency room visit in 2017 where plaintiff was disheveled and uncooperative, and a

note from an emergency room visit in 2015 where plaintiff was hyperactive, agitated, and had slurred speech. (Dkt. #18-1 at 9.)

Regarding plaintiff's ability to adapt and manage herself, APRN Trussler noted that plaintiff's general appearance was usually "unkempt, poor overall grooming." (R. 883, 886, 890.) On December 15, 2017, APRN Trussler noted, "Dana looks poorly today. She arrives late for her appointment. She is grossly unkempt wearing dirty clothes; there is a strong smell of nicotine/cigarette smoke." (R. 882.)

Dr. Orbe's treatment notes of plaintiff indicate that plaintiff had mild anxiety. (R. 1120, 1123, 1127, 1130, 1133.) Plaintiff was on Xanax when she first started treating with Dr. Orbe, and Dr. Orbe weaned her off Xanax without difficulty. (R. 1118, 1120, 1123.) Dr. Orbe at one point discussed having plaintiff try Zoloft to address her anxiety. (R. 1130.) Dr. Orbe also prescribed plaintiff Strattera for her ADHD. (R. 1133.) Dr. Orbe noted that plaintiff had good grooming and hygiene. (R. 638, 641, 645, 648, 652.)

Plaintiff testified at the hearing that she does chores "once in a blue moon" and that her youngest son helps her. (R. 61.) Plaintiff can drive, and plaintiff testified that she would drive to the park or the pharmacy down the street. (R. 63.) Plaintiff testified that both her sons take turns cooking, and

she cooks when she can. (R. 61.) Plaintiff testified that she has "a friend or two" who will go to the store for her while she sits in the car. (R. 62.) She also testified that she cannot pour a pot of coffee and that she is sometimes able to button clothing. (R. 73-74.)

Plaintiff was hospitalized due to a mental health crisis on October 18, 2017. Notes from an emergency room indicate that plaintiff was malodorous and disheveled. (R. 437, 442, 443, 952, 966, 967, 969.) The treatment notes reflect that plaintiff had abused Xanax, causing the symptoms. (R. 952, 953.) Plaintiff admitted that the Xanax was from an old prescription. (R. 951.)

In reviewing the record as a whole, the Court concludes that substantial evidence supported the ALJ's determination that plaintiff had a moderate limitation in her ability to adapt and manage herself. Plaintiff occasionally cooks, cleans, and drives her car. There is evidence in the record that demonstrates plaintiff is and is not able to maintain personal hygiene. *See* 20 C.F.R. Pt. 404, Subpt. P, §12.00(E)(4) (listing "maintaining personal hygiene and attire appropriate to a work setting" as an example of the ability to adapt or manage oneself). Dr. Orbe consistently noted that plaintiff had good grooming and hygiene while APRN Trussler noted plaintiff was unkempt. Plaintiff was noted to be disheveled during her emergency hospitalization, though the Court notes that this was a hospitalization due to

abuse of a prescription drug, and plaintiff being disheveled at this time may not be overall indicative of plaintiff's hygiene. (R. 950-51.)

Because the Court has left intact the ALJ's determination that plaintiff has only mild or moderate limitations, plaintiff does not meet the criteria for "paragraph B" at step two.

### b. *Lumbar Spine Impairment*

Plaintiff argues that the ALJ erred at step two by not finding her lumbar spine impairments to be severe. Plaintiff references several medical records from past plaintiff's date last insured and argues that "the 'chronicity' verbiage sets this condition back into the time period prior to the date last insured." (Dkt. #18-1 at 21.) Plaintiff also cites to an emergency room visit from 2010, five years before the alleged onset date, to establish plaintiff's severe lumbar impairment.

"For Plaintiff to receive disability benefits, Plaintiff's disability onset date must fall prior to his date last insured." Camacho v. Astrue, NO. 08-CV-6425, 2010 WL 114539, at *2 (W.D.N.Y. Jan. 7, 2010). Plaintiff has the burden of showing that her lumbar spine condition rendered her disabled prior to December 31, 2017. *See* Mauro v. Berryhill, 270 F. Supp. 3d 754, 762 (2d Cir. 2017); *see also* Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989) (noting that subsequent evidence of disability is

"not irrelevant to the question" of whether the plaintiff was disabled from the alleged onset date to the date last insured).

The ALJ found that plaintiff's lumbar spine impairment was not serious because the records from prior to plaintiff's date last insured did "not establish any lumbar spine impairment by medically acceptable clinical or laboratory diagnostic techniques." (R. 22.) The ALJ did note that an MRI taken "in August 2018 showed pathology to the lumbar spine." (R. 22.)

Treatment notes from June 29, 2018, show that plaintiff treated for back pain following a fall on Mother's Day. (R. 739.) The records indicate plaintiff was treated for "[l[ow back pain, unspecified back pain laterality, unspecified chronicity, with sciatica presence unspecified." (R. 740.) The clinical notes state: "Back pain in the setting of recent trauma (fall). Likely combination of musculoskeletal pain secondary to fall and her chronic pain, and not nerve related. She has multiple areas of muscle spasms and trigger points. We wil[l] try back exercises and also a muscle relaxant and repeat lumbosacral X-Ray." (R. 740.) Treatment notes from July 27, 2018, show plaintiff followed up for back pain resulting from a fall on Mother's Day. (R. 735.) Plaintiff reported her pain as "not worse but not better." (R. 737.) Plaintiff underwent an MRI on August 24, 2018, which shows multilevel degenerative disc disease. (R. 724.) The clinical indication for the MRI was left

17

side sciatica after a fall. (R. 724.) Follow up treatment notes
from September 25, 2018, indicate an impression of "Lumbago with
sciatica, left side." (R. 733.) Plaintiff's primary care
physician, Dr. William Delaney, started plaintiff on
Chlorzoxazone for her back pain and she was continued on
Percocet. (R. 733.) Dr. Delaney's treatment notes also indicate
that plaintiff received a handicap parking sticker, seemingly
related to her lumbago. (R. 733.)

Plaintiff testified at her hearing that she had been using
a cane to ambulate since 2015, but plaintiff was not prescribed
a cane until after the date last insured. (R. 1334-35.)

Plaintiff also relies on evidence from before her alleged
onset date to establish her disability during the relevant time
period. Notes from emergency room visit on February 19, 2010,
indicate that plaintiff had a traumatic low back pain for one
week with pain radiating down both legs. (R. 551.) Plaintiff had
pain throughout her range of motion but had negative left and
right straight leg tests. (R. 551.) Plaintiff's diagnosis was
sciatica, and her differential diagnosis was lumbar disc
disorder. (R. 552.)

An MRI from November 20, 2013, had an impression of
moderate mid and lower cervical spondylosis affecting C4-C7,
most pronounced centrally at C6-C7 where there is moderate
spinal stenosis with mild cervical cord deformity. (R. 529.)

18

An MRI from May 13, 2015, shows that plaintiff has a small left foraminal and slightly paracentral disc extrusion at C4-5, which could involve the left C5 nerve root, congenitally narrow spinal canal with multilevel spondylosis with mild C3-4, moderate at C4-5, mild to moderate C5-6 and moderate to severe C6-7 central stenosis. (R. 499.)

During the relevant time period, some of plaintiff's medical records indicate she has a history of degenerative disc disease. (R. 756.) Plaintiff treated with Danbury Orthopedics on June 22, 2015, and treatment notes indicate a diagnosis of neck and left arm pain and dysfunction with multilevel spinal stenosis and spondylosis and left C4-5 disc extrusion. (R. 538.) An EMG study done on May 27, 2015, the alleged onset date, shows "decreased conduction velocity" of the left ulnar motor nerve, indicating left ulnar neuropathy and left C5 radiculopathy with evidence of ongoing denervation. (R. 366.) Treatment notes from May 30, 2016, with Dr. Frank Hermantin indicate that plaintiff had minimal tenderness to palpation on her cervical spine and had a range of motion without difficulty. (R. 467.) Plaintiff also indicated that she had been going to physical therapy for her back, which she thought was helpful and helped her get some range of motion back. (R. 467.)

Treatment notes with Dr. F. Scott Gray on June 8, 2016, show the results of a cervical exam revealing tenderness in

plaintiff's lower spine, limitations in extension to about 10 degrees, and fairly good forward and side-to-side rotation. (R. 466.) Dr. Gray indicated that plaintiff had some "cervical spine trouble."

Overall, the record indicates that plaintiff experiences some form of spine disorder. There is evidence before her alleged onset date indicating some form of impairment, namely spinal spondylosis, which plaintiff treated for by receiving injections during the relevant time period. But there is no evidence in the record to support that plaintiff's spinal impairment was disabling between her alleged onset date and date last insured. No doctor gave plaintiff a diagnosis that contradicts the ALJ's findings, that there was no medically determinable lumbar spine impairment, during the relevant period. *See* Camacho v. Astrue, No. 08-CV-6425, 2010 WL 114539, at *4 (W.D.N.Y. Jan. 7, 2010). There is no error.

### c. Treating Physicians

Plaintiff argues that the ALJ provided no basis for a credibility or weight determination, and the opinions of plaintiff's treating physicians were entitled to controlling weight. (Dkt. #18-1 at 19-20.)

The Court notes that standard plaintiff relies on, formerly known as the treating physician rule, only applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. Under the

new regulations, an ALJ is required to "articulate how he considered the medical opinions and how persuasive he finds the opinions." Jacqueline L. v. Comm'r of Soc. Sec., 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021). "The Regulations define a medical opinion as 'a statement from a medical source about what you can still do despite your impairments.'" Juan T. v. Kijakazi, No. 3:20CV01869(SALM), 2021 WL 4947331, at *7 (D. Conn. Oct. 25, 2021).

An ALJ determines the persuasiveness of the medical opinions by assessing five factors: supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(a)-(c). Supportability and consistency are the factors given the most weight. 20 C.F.R. § 404.1520c(b)(2). An ALJ must point to specific evidence in the record to support his or her findings. Jacqueline L., 515 F. Supp. 3d at 11. "The ALJ must explain how he considered the 'supportability' and 'consistency' factors in the evaluation, but the ALJ need not explain how he considered the secondary factors unless the ALJ finds that two or more medical opinions regarding the same issue are equally supported and consistent with the record but not identical." Jessica P. v. Kijakazi, No. 3:21-cv-84(SRU)(RAR), 2022 WL 875368, at *3 (D. Conn. Mar. 4, 2022) (quoting 20 C.F.R. § 404.1520c(b)). "Although the new regulations eliminate the perceived hierarchy of medical

sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still articulate how he or she considered the medical opinions and how persuasive he or she finds all of the medical opinions." Jacqueline L., 515 F. Supp. 3d at 8 (internal quotation marks and citation omitted).

The ALJ wrote, "As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinion(s), including those from medical sources." (R. 27.) The State Agency examiners found that plaintiff was limited to unskilled work and that there was insufficient evidence to evaluate plaintiff's physical impairments. (R. 27, 90-91, 104-05.)

The ALJ then found the state agency consultants partially persuasive because of a lack of substantive analysis. (R. 27.) The ALJ disagreed and noted that he had assigned plaintiff a light RFC because of the diagnostic testing, orthopedic treatment, and pain medication and injections that plaintiff had undergone to treat her spine. (R. 27.) The ALJ agreed that plaintiff was limited to unskilled work based on her mental health treatment records. (R. 27.)

Plaintiff does not argue that the ALJ erred in his assessment of the State Agency examiner's medical opinions.

Plaintiff instead argues that "[c]omparatively speaking with regard to the State Agency consultants, the Plaintiff's physicians (Greater Danbury Community Health Center—formerly Seifer & Ford Clinic and Danbury Orthopedic Associates) have a long standing relationship with the Plaintiff and Plaintiff's physicians have the benefit of routinely seeing the Plaintiff in person, versus a review of only paper reports as most State agency consultants use as the basis for their opinions." (Dkt. #18-1 at 20.) But as defendant points out, there is no opinion from any of plaintiff's medical providers. Plaintiff instead appears to be arguing that the ALJ should have discussed the overall credibility of plaintiff's medical records, though none of plaintiff's treaters opined as to "what [plaintiff] can still do despite [her] impairments." 20 C.F.R. § 416.913(a)(2). While the medical source opinion can take any form, the Court has been unable to find, and plaintiff does not cite to, any opinion as to plaintiff's functional limitations in the record. Accordingly, the Court finds no error.

### d. The ALJ's RFC Determination

Plaintiff argues that the RFC determination is not consistent with the medical records. (Dkt. #18-1 at 12.) Plaintiff argues that the medical records show that she has an inability to balance and climb stairs or ramps, that she cannot occasionally reach in front at waist level, and that her

inability to concentrate, persist, or maintain pace means she would have a rate of absenteeism or off task behavior that would be job preclusive.

Plaintiff argues that the ALJ erred in finding that plaintiff cannot perform her past relevant work but can perform other light work in the national economy under the same section of her brief. However, the Court perceives this as an argument related to step five, and not the RFC determination, so the Court will discuss that issue separately.

Defendant argues that plaintiff rehashes the same evidence that the ALJ considered when determining plaintiff's RFC. (Dkt. #22-1 at 17.)

### i.   *Balancing and Climbing Stairs/Ramps*

Plaintiff argues that the evidence in the record demonstrates that plaintiff's ability to balance is severally limited. (Dkt. #18-1 at 13-14.) Plaintiff relies on two records after her date last insured to demonstrate that she requires a cane and that she is a fall risk. (Dkt. #18-1 at 13.) However, as previously discussed, these records do not demonstrate that plaintiff was unable to balance during the relevant time period.

The remaining medical records do not amount to substantial evidence. Plaintiff relies on a medical record showing that plaintiff slipped on ice as well as her testimony from the hearing where she testified that she uses a cane, has balance

issues despite the cane, and that she does not utilize stairs
much. (Dkt. #18-1 at 14.) The substantial evidence standard is
an extremely low threshold; as long as there is "more than a
mere scintilla" of evidence, the ALJ's decision must be upheld.
Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal
quotation marks and citation omitted). A record indicating that
plaintiff slipped on ice and her subjective testimony alone are
not enough to disturb the ALJ's finding that plaintiff can
frequently balance, kneel, and climb stairs/ramps.

### ii. *Occasional Reaching in Front at Waist Level*

Plaintiff argues that the medical record supports that she
can only occasionally reach in front of herself, which would
preclude most light or sedentary work. Plaintiff argues that
"[t]he combination of diagnostic testing ordered by a
specialists and the office visit physical examinations performed
provide credible evidence of Plaintiff's ongoing and
acute/severe limitations regarding her cervical spine and left
master shoulder." (R. 18-1 at 18.)

Plaintiff cites to medical records showing left and right
shoulder cuff tears, cervical radiculopathy, poor range of
motion in her left arm, and ulnar neuropathy of the left arm.
(Dkt. #18-1 at 15.) Plaintiff also cites evidence showing that
more moderate treatments, including NSAIDs, Gabapentin, Lyrica,
steroid injections, and physical therapy had failed. (Dkt. #18-1

at 14-15.) Plaintiff was recommended as a candidate for surgery. (Dkt. #18-1 at 14.)

The ALJ considered these records and other, conflicting records. The ALJ considered that in 2015, plaintiff had reduced neck and shoulder range of motion, intact upper extremity sensation with the exception of her left hand, and grossly intact upper extremity strength. (R. 25-26.) The ALJ considered that in 2016, plaintiff had reduced neck and shoulder range of motion and evidence of a shoulder impingement, but no shoulder instability, and plaintiff's pain was well tolerated. (R. 26.) Between 2016 and 2017, plaintiff presented with notable strength deficits at one primary care appointment, though the ALJ noted "this was during an acute pain exacerbation and is at odds with the other findings from this provider as well as the claimant's orthopedist." (R. 26.) The ALJ also considered that plaintiff had refused surgery since 2015 despite the failure of more conservative treatment methods. (R. 26.) The ALJ also considered plaintiff's testimony, specifically her ability to button buttons. (R. 26.)

The record also reflects that plaintiff was unwilling to allow her primary care physician to examine her arm. (R. 755.) At a February 3, 2017, visit, plaintiff's right shoulder had "severe limited active [range of motion] secondary to pain" but her passive range of motion was intact. (R. 760.) On July 22,

2016, plaintiff was noted to have full strength in her right arm
and 4/5 strength in her left arm. (R. 763.) Plaintiff's left arm
had a limited range of motion due to pain, and she could not
abduct beyond 90 degrees. (R. 763.) Though the section titled
"History of Present Illness," indicated that plaintiff had a
right shoulder rotator cuff tear, only a left rotator cuff tear
arthropathy was mentioned in the "Assessments" and "Treatment"
sections of this visit. (R. 762-63.) Plaintiff's pain was noted
to be controlled on her current regimen of Lyrica and Lidoderm.
(R. 763.) The evidence in the record supports that plaintiff has
some limitations regarding the range of motion in her left
shoulder but does not support that plaintiff cannot occasionally
reach in front of her. The record shows that plaintiff's pain
has not been well managed with medication, specifically
Gabapentin and Lyrica, and that plaintiff is in pain, but aside
from one isolated incident referenced by the ALJ generally does
not show a highly impaired range of motion. (R. 750-755.)
References to plaintiff's right shoulder and range of motion are
more isolated, and do not overall suggest that she is limited
beyond occasional reaching. Accordingly, there is substantial
evidence to support the ALJ's RFC determination with respect to
plaintiff's ability to occasionally reach.

### iii. *Absenteeism and "Off Task" Behavior*

Plaintiff argues that the record supports that plaintiff would be chronically off-task or absent due to limitations in her ability to concentrate, persist, and maintain.

At the hearing, the VE testified that being off task for more than 10% of the workday or being absent more than one day per month would preclude an individual from a job in a competitive labor market. (R. 80.)

The ALJ limited plaintiff to simple, routine, repetitive tasks in a work setting with only occasional changes to accommodate plaintiff's mental impairments. (R. 27.) Courts have typically found that a limitation to simple, routine, repetitive tasks properly accommodates a moderate limitation in an individual's ability to concentrate, persist, or maintain pace. Allen v. Comm'r of Soc. Sec., 351 F. Supp. 3d 327, 338 (W.D.N.Y. 2018).  The Court has not been directed to, and is not aware of, any medical opinions or evidence in the record that clearly states that plaintiff would be off task more than ten percent of the time or miss one or more days of work per month. Additionally, the ALJ's RFC determination and the finding related to plaintiff's concentrating, persisting, or maintaining pace have been found, in this ruling, to be supported by substantial evidence.  Without explicit evidence concerning plaintiff's absenteeism or a medical opinion supporting a

percentage of off task behavior plaintiff's argument is
unconvincing.

### e. Step Five Error

Plaintiff argues that the ALJ's finding at step five, that
there were jobs in the national economy that plaintiff could
perform, furniture rental clerk, counter clerk, and usher, is
inconsistent with the RFC that the ALJ assigned at step four.
(Dkt. #18-1 at 10-11.)  Plaintiff argues that her past relevant
work experience, shipping order clerk and general office clerk,
have overlapping duties with the representative jobs. (Dkt. #18-
1 at 11.)

First, as defendant notes, plaintiff's argument about the
ALJ's finding that plaintiff can perform the jobs of furniture
rental clerk, counter clerk, and usher, is at bottom an argument
regarding the vocational expert's testimony. (Dkt. #22-1 at 18.)
At the hearing, the ALJ presented a hypothetical for a full
range of light work, limited to simple, routine, repetitive
tasks in a work setting with only occasional changes and limited
to only frequent handling, fingering, and feeling with the
bilateral upper extremities. (R. 78.) The vocational expert
opined that plaintiff's past relevant work of general office
clerk and would be precluded because it involves frequent
reaching, handling, and fingering and because it is a semi-
skilled position while the RFC required simple work. (R. 78-79.)

The vocational expert opined that furniture rental clerk, counter clerk, and usher were all unskilled positions that required only occasional reaching, handling, and fingering. (R. 79.)

Plaintiff argues that her testimony about how she performed her past relevant work overlaps with the job duties of a furniture rental clerk and a counter clerk because they require "[t]he collection of information, data entry, interaction with the public (third parties and/or customers), selling, financial transactions, contract management or drafting/packaging." (Dkt. #18-1 at 12.)

At step five, the ALJ must determine "that significant numbers of jobs exist in the national economy that the plaintiff can perform." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert. An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions on which the vocational expert based his opinion, and accurately reflect the limitations and capabilities of the claimant involved." Id. (alterations omitted) (internal quotation marks and citations omitted). The burden is on the Commissioner at step five to prove there are jobs that the plaintiff can perform. Peter B. v.

<u>Kijakazi</u>, No. 3:20-cv-00966-TOF, 2022 WL 951689, at *11 (D. Conn. Mar. 30, 2022). In evaluating a vocational expert's testimony, "the Second Circuit does not require a detailed scrutiny of a vocational expert's methods." <u>Debiase v. Saul</u>, No. 3:19 CV 68(RMS), 2019 WL 5485269, at *11 (D. Conn. 2019).

Plaintiff does not argue that the vocational expert's testimony regarding how these jobs are performed, and how her past relevant work was performed, is erroneous. Plaintiff's argument is simply that the job functions themselves are similar. There is substantial evidence to support the ALJ's determination that plaintiff can perform the jobs of furniture rental clerk, counter clerk, and usher. The positions for shipping order clerk and general office clerk, which comprise plaintiff's past relevant work, are both semi-skilled at an SVP of 4. (R. 28.) The positions of furniture rental clerk, counter clerk, and usher are all unskilled with an SVP of 2. (R. 29.) Even though plaintiff argues job duties overlap, the DOT classifies the jobs at different levels, which is supported by the ALJ's testimony. (R. 79.) The vocational expert's testimony also supports that the jobs are different, and plaintiff, again, does not argue that the ALJ improperly relied upon the ALJ's testimony.

"The VE submitted his credentials, identified the sources he used to arrive at his conclusions, and fully explained his

methodology." <u>Harper v. Berryhill</u>, No. 3:16CV01168(SALM), 2017 WL 3085806, at *16 (D. Conn. July 20, 2017); <u>Debiase v. Saul</u>, No. 3:19 CV 68 (RMS), 2019 WL 5485269, at *11-12 (D. Conn. Oct. 25, 2019); <u>Poole v. Saul</u>, 462 F. Supp. 3d 137, 164-65 (D. Conn. 2020). Plaintiff's attorney also had an opportunity to cross examine the vocational expert and object to his qualifications. <u>Harper</u>, 2017 WL 3085806, at *16; <u>Debiase</u>, 2019 WL 5485269, at *11-12; <u>Poole v. Saul</u>, 462 F. Supp. at 164-65. The Court finds that the ALJ reasonably relied on the VE's testimony, so there is no error at step five.

<u>**CONCLUSION**</u>

Based on the foregoing reasons, plaintiff's motion for an order to reverse or remand the Commissioner's decision (Dkt. #18) is DENIED and the Commissioner's motion to affirm that decision (Dkt. #22) is GRANTED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. <u>See</u> <u>28 U.S.C. § 636(c)(3)</u>.

SO ORDERED this 28th day of September, 2022, at Hartford, Connecticut.

/s/<br>_____<br>Robert A. Richardson<br>United States Magistrate Judge